KIBLER FOWLER & CAVE LLP
Matthew J. Cave (SBN 280704)
mcave@kfc.law
Kevin J. Cammiso (SBN 316540)
kcammiso@kfc.law
Charles Cardinal (SBN 322991)
ccardinal@kfc.law
11100 Santa Monica Blvd., Suite 360
Los Angeles, California 90025
Telephone:  (310) 409-0400
Facsimile:  (310) 409-0401

*Attorneys for Plaintiffs*
*Jonah Hirsch and Zypre, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JONAH HIRSCH, an individual; and ZYPRE, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>PICTURE THIS PRODUCTIONS LIMITED, a United Kingdom company; ADVANCED MICRO DEVICES, INC., a Delaware corporation; BRITISH AIRWAYS PLC, a United Kingdom corporation; and DOES 1-10, inclusive,<br><br>Defendants. | CASE No. 22-cv-7123<br><br>**COMPLAINT FOR:**<br><br>1. **COPYRIGHT INFRINGEMENT;**<br>2. **CONTRIBUTORY COPYRIGHT INFRINGEMENT;**<br>3. **BREACH OF CONFIDENCE;**<br>4. **BREACH OF CONTRACT;**<br>5. **UNFAIR COMPETITION;**<br>6. **TRADE SECRET MISAPPROPRIATION (Cal. Civ. Code §§ 3426,** *et seq.***); and**<br>7. **TRADE SECRET MISAPPROPRIATION (18 U.S.C. §§ 1836,** *et seq.***)**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiffs Jonah Hirsch ("Hirsch") and Zypre, Inc. ("Zypre," and together with Hirsch, "Plaintiffs"), demanding trial by jury, complain and allege as follows:

## INTRODUCTION

1. Hirsch is a writer and producer. He has dedicated much of his life to creating innovative and groundbreaking projects, including his 2015 project *First*, an immersive virtual reality ("VR") production that takes viewers through a historically accurate recreation of the landmark 1903 flight of the Wright Brothers, the two Americans credited with inventing and flying the first successful motor-operated airplane. Much like that 1903 flight, *First* was the first of its kind; it has made a remarkable contribution to the fields of education, entertainment, and technology.

2. *First* was a labor of love for Hirsch. The five-year development of *First* required numerous trips to North Carolina and Ohio for location scouting, as well as numerous trips to Washington D.C. to meet with Smithsonian curators at the National Air & Space Museum. In addition to time, Hirsch and Zypre collectively invested roughly $500,000 into the development of *First*, without Hirsch ever taking a salary.

3. In or around June 2015, *First* was presented by AMD at E3, a major trade event in Los Angeles, to great critical acclaim. Hirsch received his rightful recognition in multiple publications, including a cover story in the Financial Times and Los Angeles Business Journal. *First* was a major hit.

4. Hirsch is the sole and exclusive owner of all intellectual property associated with *First*, which was registered with the United States Copyright Office in 2017. Yet, in or around November 2020, Hirsch discovered a project titled *Fly* available on Viveport for purchase, an outlet for VR distribution, in which an image derived directly from *First* source files was used to market the piece for commercial use. This image, therefore, could only have been created by someone who possessed access to said files and technical expertise.

5. Hirsch subsequently discovered that *Fly* had been created by Picture This Productions and commissioned by British Airways to celebrate the company's one-hundred year anniversary. Not coincidentally, in addition to illegally using intellectual property from *First*, *Fly* incorporates an idea that Hirsch had pitched to British Airways in 2015 about commemorating the first flight of the Concorde through a VR experience.

6. The image from *First* that appears in *Fly* was never publicly available. In fact, Hirsch has kept it that way because he plans to create a sequel to *First* with a higher production value. Production of the sequel has been ongoing since 2017, with a two-dimensional demo already available to the public. The sequel's full VR experience is currently in hold and cannot be released pending resolution of this matter.

7. Unfortunately, someone close to Hirsch and with access to the *First* source files (which were stored on a secure, external hard drive), disseminated Hirsch's protected intellectual property without permission. On information and belief, that person is James Knight, who worked for Zypre and Advanced Micro Devices, which apparently provided these materials to Picture This Productions and British Airways without permission.

8. Hirsch brings this civil action against Picture this Productions, a United Kingdom company; Advanced Micro Devices, Inc., a Delaware corporation; and British Airways, a United Kingdom corporation (collectively, "Defendants") for their acts of willful copyright infringement in violation of the United States Copyright Act, as codified in 17 U.S.C. §§ 101 *et seq.*, as well as their breaches of confidence, breaches of contract, fraudulent concealment, unfair competition, and trade secret misappropriation in violation of the United States Defend Trade Secrets Act, as codified in 18 U.S.C. §§ 1836, *et seq.*, and the California Uniform Trade Secrets Act, as codified in California Civil Code §§ 3426, *et seq*.

//

## JURISDICTION AND VENUE

9. This Court has jurisdiction over Plaintiffs' copyright and trade secret claims under 28 U.S.C §§ 1331 and 1338, 17 U.S.C. § 501(a), and 18 U.S.C. § 1836(c). This Court also has supplemental jurisdiction over Plaintiffs' related claims under 28 U.S.C. § 1367(a).

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c), and 28 U.S.C. § 1400(a) because the claims arise in this District, the Defendants transact business in this Judicial District, and the injury suffered by Plaintiffs occurred in this Judicial District.

## THE PARTIES

11. Plaintiff Jonah Hirsch is, and at all times relevant hereto was, a resident of Los Angeles County, California.

12. Plaintiff Zypre, Inc. is a Delaware corporation that, at all relevant times, maintained its principal place of business in the State of California.

13. On information and belief, Defendant Picture this Productions Limited ("Picture This") is a company located in Richmond, United Kingdom.

14. Defendant Advanced Micro Devices, Inc. ("AMD") is a Delaware corporation that maintains its principal place of business in the State of California.

15. Defendant British Airways, PLC ("British Airways") is a subsidiary of the International Consolidated Airlines Group S.A. British Airways is incorporated under the laws of England and Wales. Its corporate headquarters is in Harmondsworth, United Kingdom. British Airways' North American headquarters is in New York, New York.

16. Plaintiffs are unaware of the true names and capacities of Defendants named as Does 1 through 10, inclusive. Plaintiffs will amend this Complaint to state said Defendants' true names and capacities when the same have been ascertained. Plaintiffs are informed and believe, and upon that basis allege, that said fictitiously named Defendants are responsible in some manner for the injuries and damages to

Plaintiffs, as alleged herein.

17. At all times herein mentioned, all Defendants were the agents and/or co-conspirators of their co-defendants, and in doing the things hereinafter alleged, were acting within the course and scope of their authority as those agents and/or co-conspirators and with the permission and consent of their co-defendants.

## GENERAL ALLEGATIONS

### *The Creation of First*

18. In 2010, Hirsch partnered with financier Frank Fornari ("Fornari") to produce a feature film on the Wright Brothers' landmark 1903 flight. The working title for their film was *First*.

19. Over the next few years, Hirsch and Fornari devoted much of their professional lives to developing *First*. Among other things, they optioned a script from Sony that had been written for Francis Ford Coppola, hired an experienced screenwriter, and hired world-renowned artist Shepard Fairey to create an original marketing poster. They also outlined budgets, created marketing materials, and made several trips to North Carolina and Ohio for location scouting, as well as several trips to Washington D.C. to meet with Smithsonian curators at the National Air & Space Museum.

20. Looking to complement *First* and expand its reach into other forms of media, Hirsch, Fornari and Gwen Bauer (Fornari's wife) formed Zypre in 2014 for the purpose of creating a VR production of *First*. Hirsch, together with Zypre, invested roughly $500,000 to develop *First*, and Hirsch took no salary for his work.

21. In 2014, Hirsch and Fornari hired a director for the film version of *First*. At the time envisioning *First* as an animated film, the director recommended hiring James Knight as a visual effects supervisor.

22. During the interview process with Hirsch and Fornari, Knight falsely claimed to have been a major contributor to the special effects of the blockbuster animated film *Avatar*. Unbeknownst to Hirsch and Fornari, Knight only had a

minor role of scheduling actors for visual effects in *Avatar*. But based on his fabricated qualifications, Knight was hired by Zypre.

23. Shortly after being hired, Knight informed Hirsch and Fornari that, through "a friend" who worked at AMD, Knight knew the company was looking to sponsor a VR project.

24. Based on Knight's recommendation, Hirsch and Fornari met with AMD. Given a much lower sponsorship offer for *First* than anticipated, Hirsch and Fornari were hesitant to finalize a deal with AMD; however, Knight convinced Zypre to accept AMD's lowball offer.

25. On or around March 26, 2015, an agreement between AMD and Zypre was signed for AMD to sponsor the VR experience *First*. A true and correct copy of the Development Agreement is attached hereto as **Exhibit 1**.

26. At the time of entering into the Development Agreement, AMD was transitioning its diminishing business from focusing on computer processors to graphics cards, which is why AMD was interested in VR technology. Since this transition, AMD's stock value has skyrocketed.

27. Per the Development Agreement, AMD was granted a limited three-year license for the display of *First*, its promotional materials, and use of its software. Zypre, however, was to retain all intellectual property rights connected to the project as the sole and exclusive owner. Furthermore, AMD was bound to a strict confidentiality and non-disclosure provision that explicitly stated that certain aspects of *First*, such as its software, could be shared only internally within AMD. Zypre also required AMD to execute a Nondisclosure Agreement to further protect its confidential and proprietary intellectual property, all of which was stored on an external hard drive.

28. By mid-to-late 2015, with all the momentum that had built behind *First* as a VR experience, *First* as a traditional film project was no longer pursued. Hirsch poured all of his efforts into the *First* VR project.

29. Over the summer of 2015, *First* as a VR experience was featured at several entertainment and technology events and received a wonderful reception from audiences and critics alike. For example, in June of 2015, *First* was featured at E3, a trade event for the video game industry (the largest one) held annually in Los Angeles, California. Shortly after E3, Hirsch was interviewed by Financial Times Magazine and a front page story on the VR industry and *First* was subsequently published in December.

30. In July of 2015, *First* was featured at AMD's booth at San Diego's Comic Con. Fortune Magazine named *First* as one of the "top five experiences" at the event. To close out the summer, in August of 2015, *First* was featured at AMD's booth at Siggraph, the largest computer graphics event in the United States. *First* was also featured at the Toronto Film Festival and on the Discovery Channel.

31. After the initial success of *First* as a VR experience, Hirsch began to contemplate developing a new VR documentary project—recreating the flight of the Concorde, a British supersonic passenger airline that operated from 1976 until 2003 and that Mr. Hirsch flew on a number times.

32. Knight set up numerous calls and email exchanges between Hirsch and British Airways senior management, through his supposed connections, to discuss the company's potential interest as a sponsor of Hirsch's new VR concept. Although British Airways showed strong interest, discussions ended upon Knight's termination.

33. Shortly after Hirsch's talks with British Airways concluded, Knight, who was being paid a salary of $150,000 plus benefits by Zypre, was fired for dereliction of his duties as an employee. Put simply, Knight was doing nothing.

34. Years later, Hirsch and Fornari discovered that Knight had been working for AMD while also working for Zypre. On information and belief, Knight was on AMD's payroll throughout the majority of his professional engagement with Zypre. Knight's "friend" who worked at AMD and knew the company was looking

for a VR project to sponsor was a farce; it was Knight himself who knew what AMD, his other employer, was looking for. Additionally, Knight pressured Zypre to agree to AMD's lowball sponsorship offer for *First* because Knight was working for AMD. Knight was operating under a completely different professional identity than what he shared with Hirsch and Fornari.

35. Livid and demoralized from the revelation of Knight's relationship with AMD, Fornari and Bauer (Hirsch's partners in Zypre) disengaged from *First*.

36. On or around April 20, 2017, Fornari and Bauer assigned Hirsch all of their rights to *First*. Upon the execution of the assignment, Hirsch became the sole and exclusive owner of *First*, including all intellectual property.

37. On or around July 10, 2017, Hirsch successfully registered *First* with the U.S. Copyright Office (Registration No. PAU003871052).

### *The Misappropriation and Infringement of Hirsch's Intellectual Property*

38. In November of 2020, Hirsch was made aware of a VR creation titled *Fly* being distributed on Viveport, a major streaming and distribution service for VR productions.

39. *Fly*, it turns out, was created by Charlotte Mikkelborg of Picture This, commissioned by British Airways to celebrate its one-hundred year anniversary. *Fly* was heavily promoted as part of a massive public relations campaign (including by British Airway's CEO). *Fly* was even featured at London's prestigious Saatchi Gallery. There very well could be additional places *Fly* was shown; the full extent of its distribution in other areas is unknown by Hirsch at this time.

40. Upon immediate inspection, Hirsch noticed the striking, undeniable similarities between *Fly* and *First*. Indeed, *Fly* contained the same VR rendition of the Wright Brothers' 1903 flight portrayed in *First*, as well as an identical image used to market *First*. Multiple scenes and images in *Fly* are, at a minimum, derivative of *First*. The only way Picture This or British Airways could have obtained these materials was from someone with access to the external hard drive

containing all of the research materials, data files, VR files, schematics, and other confidential information vital to the creation of *First*.

41. Notably, it appears that Picture This and British Airways deliberately chose which image to use from *First* in a failed effort to avoid detection. For example, *Fly* uses only content from *First* without human characters, and since the Wright Brothers appear stylistically different in *First* and *Fly*, inclusion of content from *First* with their images would have been even more readily apparent. But the similarities are easy enough to detect despite the bad-faith, willful efforts to avoid detection.

42. *Fly* was not in fact "one of a kind," as promoted by Picture This and British Airways. And, adding insult to injury, *Fly* also contained a VR depiction of the flight of the Concorde—the exact same VR idea Hirsch had pitched to British Airways years prior.

43. Hirsch, rightfully concerned by this egregious piracy of his intellectual property, reached out to Picture This and British Airways in December of 2020. Through this correspondence, Hirsch discovered that, among other things, Picture This and British Airways had received his confidential intellectual property, including but not limited to the copyrighted materials used in *Fly*, from none other than AMD, where Hirsch's former employee Knight works and, on information and belief, continues to be work. Yet, despite repeated requests, Picture This and British Airways refused to answer Hirsch's specific questions about what they received from AMD, what they paid for it, who provided the confidential materials, and what exactly was provided. Notably, however, neither Picture This nor British Airways have denied possession of Hirsch's intellectual property; they have refused to disclose what they have, how they received it, and how much money they received.

44. Hirsch has never permitted the source files of his creative work *First* to be released to anyone beyond the parties involved in production of *First* and subject to the contractual restrictions in the Development Agreement and Nondisclosure

Agreement. Neither AMD nor Knight had the right or permission to share intellectual property from *First* with Picture This or British Airways.

### FIRST CAUSE OF ACTION

### Copyright Infringement

### (Hirsch Against Picture This Productions and British Airways)

45. All previous allegations are realleged and incorporated herein by reference.

46. Hirsch is the sole and exclusive owner of the entire copyright in *First*, which is an original work of authorship fixed in a tangible medium of expression. Hirsch registered *First* with the United States Copyright Office on July 10, 2017 (Reg. No. PAU003871052).

47. Hirsch has not granted any license or otherwise permitted Picture This or British Airways to use his copyrighted material.

48. British Airways' VR production *Fly*, created by Picture This, bears substantial similarity to Hirsch's copyrighted material, which has and continues to be available through VR distribution networks.

49. On information and belief, Picture This and British Airways had direct access to Hirsch's copyrighted material through, at the very least, AMD and Knight, both of whom had access to Hirsch's work *First* and the external hard drive containing all *First* materials, and were in communication with British Airways. In fact, British Airways' *Fly* production is so strikingly similar to Hirsch's copyrighted material that independent creation is virtually impossible.

50. As such, with *Fly*, Picture This and British Airways have violated and are continuing to violate Hirsch's exclusive rights under 17 U.S.C. §§ 106 and 501, including but not limited to Hirsch's exclusive rights to reproduce, prepare derivative works, distribute, and display copies of his work.

51. As an actual and proximate result of such copyright infringement, as described herein, Hirsch has suffered and will continue to suffer damages in an

amount to be proven at trial.

52. Picture This and British Airways' copyright infringement was committed maliciously, fraudulently, and oppressively with willful and conscious disregard of Hirsch's rights and with the wrongful intent to injure Hirsch.

## SECOND CAUSE OF ACTION

### Contributory Copyright Infringement

### (Hirsch Against AMD)

53. All previous allegations are realleged and incorporated herein by reference.

54. By permitting and encouraging Picture This and British Airways to create derivative works based on *First* (most likely for their own financial benefit), AMD induced, caused, and/or materially contributed to the infringing activity of Picture This and British Airways.

55. AMD knew or had reason to know that materially contributing to British Airways' use of Zypre's (and later Hirsch's) copyrighted material for purposes of trade would contribute to infringement of Hirsch's copyrighted material.

56. As an actual and proximate result of AMD's contributory copyright infringement, as described herein, Hirsch has suffered and will continue to suffer damages in an amount to be proven at trial.

57. AMD's contributory copyright infringement was committed maliciously, fraudulently, and oppressively with willful and conscious disregard of Hirsch's rights and with the wrongful intent to injure Hirsch.

## THIRD CAUSE OF ACTION

### Breach of Contract

### (Zypre Against AMD)

58. All previous allegations are realleged and incorporated herein by reference.

//

59. In 2015, Zypre and AMD entered into two separate contracts: the Development Agreement and the Nondisclosure Agreement. The Development Agreement, referenced in the General Allegations Section above, is attached hereto as Exhibit 1.

60. Zypre performed, or substantially performed, all of its obligations under the Development Agreement and the Nondisclosure Agreement.

61. AMD breached the Development Agreement and Nondisclosure Agreement by sharing Zypre's confidential intellectual property regarding *First* with unlicensed third parties, including Picture This and Defendant British Airways.

62. As an actual and proximate result of AMD's breaches of the Development Agreement and the Nondisclosure, Zypre has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Breach of Confidence

### (Zypre Against AMD)

63. All previous allegations are realleged and incorporated herein by reference.

64. In or about early 2015, Zypre and AMD entered into a contractual relationship whereby AMD sponsored the project *First*. Zypre provided AMD with access to *First* and all confidential *First* marketing materials.

65. As such, Zypre, on the one hand, and AMD, on the other hand, entered into a confidential relationship based on their conduct whereby Zypre conditioned its disclosure of its confidential and original ideas, concepts, and expressions on AMD's agreement to not use those confidential materials or distribute them to anyone without Zypre's knowledge and consent.

66. AMD voluntarily accepted Zypre's confidential and original ideas, concepts, and expressions, knowing that they were being disclosed in confidence, and that before they distributed Zypre's work to anyone, they would need to obtain

1 Zypre's consent to do so.

2     67. AMD's conduct implied and led Zypre reasonably to believe that AMD would not divulge its confidential and original ideas, concepts, and expressions without Zypre's permission.

    68. Zypre performed all conditions, covenants, and promises required to be performed on its part in accordance with its agreements with AMD.

    69. AMD breached their confidence with Zypre by disclosing and divulging its confidential and original ideas, concepts, and expressions to Picture This and British Airways, without informing Zypre and without its permission.

    70. As an actual and proximate result of AMD's material breach of confidence, Zypre has suffered, and will continue to suffer, damages in an amount to be proven at trial.

    71. AMD subjected Zypre to extreme hardship, and by way of their intentional deceit, misrepresentation, and concealment of material facts, AMD intentionally deprived Zypre of property and legal rights to Zypre's detriment.

## FIFTH CAUSE OF ACTION

**Unfair Competition**

**(Hirsch Against Picture This Productions and British Airways)**

    72. All previous allegations are realleged and incorporated herein by reference.

    73. California Business and Professions Code §§ 17200, *et seq.*, prohibits unlawful, unfair and fraudulent business practices.

    74. Defendants Picture This and British Airways falsely represented themselves in *Fly* as the creators of the copyrighted images from *First*, thereby causing confusion regarding who created the work among consumers.

    75. Because of the unlawful, unfair and fraudulent conduct of Picture This and British Airways, Hirsch was deprived of the ability to control his creative work.

//

76. As an actual and proximate result of Defendants' unfair competition, Hirsch has suffered, and will continue to suffer damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Trade Secret Misappropriation

### (Cal. Civ. Code §§ 3426, *et seq.*)

### (Hirsch Against AMD and Picture This Productions)

77. All previous allegations are realleged and incorporated herein by reference.

78. Hirsch is the sole and exclusive owner of confidential trade secret information, including but not limited to: financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes regarding *First*. Such information was stored on an external hard drive that contained, specifically, all of the historical research, storyline and plot details, economic information, source code, object code, and VR schematics and blueprints used to create *First,* among other confidential materials.

79. Hirsch obtained exclusive ownership of his confidential trade secret information from Zepre.

80. Hirsch's confidential trade secret information consists of one or more trade secrets because it derives actual and potential independent economic value from not being generally known to, and not readily ascertainable through proper means by, persons who can obtain economic value from its disclosure or use. For example, by misappropriating Hirsch's confidential trade secret information, Hirsch is informed and believes that Picture This was able to produce *Fly* in just a fraction of the time and at a fraction of the cost that it took to produce *First*.

81. Zepre and Hirsch took reasonable precautions to protect this confidential trade secret information, including but not limited to: by maintaining

the confidential trade secrets on a secure hard drive, granting access to such information only to those with a need for such access, requiring AMD to agree to a confidentiality and nondisclosure provision in its Development Agreement with Zepre, entering into a Nondisclosure Agreement between AMD and Zepre, and forbidding employees and other from disclosing such information to competitors or other third parties who might gain from knowledge of such information.

82. During the course of their business relationship, AMD also had access to Hirsch's confidential trade secret information under circumstances giving rise to a duty to maintain the secrecy of Hirsch's confidential trade secret information.

83. Sometime during AMD's business relationship with Zepre, or after the business relationship had ended, AMD improperly accessed, copied, and disclosed Hirsch's confidential trade secret information to others, including but not limited to Picture This.

84. Picture This knew or had reason to know that AMD had acquired this information by improper means.

85. Nevertheless, Picture This improperly used, and continues to improperly use, Hirsch's confidential trade secret information without Hirsch's consent or permission.

86. As a direct and proximate result of AMD's and Picture This' willful, improper, and unlawful misappropriation of Hirsch's confidential trade secret information, Hirsch has suffered, and will continue to suffer, damages in an amount to be proven at trial. Hirsch will continue to be irreparably harmed unless AMD and Picture This are enjoined from further use and/or disclosure of Hirsch's confidential trade secret information under California Civil Code § 3426.2.

87. Pursuant to California Civil Code § 3426.3(a) and (b), Hirsch is entitled to damages for his actual loss and unjust enrichment not addressed in computing damages for actual loss, or a reasonable royalty.

//

88. AMD's and Picture This' willful, improper, and unlawful misappropriation of Hirsch's confidential trade secret information was and continues to be willful and malicious, warranting an award of exemplary damages as provided by California Civil Code §§ 3294 and 3426.3(c), and reasonable attorneys' fees, as provided by California Civil Code § 3426.4.

**SEVENTH CAUSE OF ACTION**

**Trade Secret Misappropriation**

**(18 U.S.C. §§ 1836, *et seq*.)**

**(Hirsch Against AMD and Picture This Productions)**

89. All previous allegations are realleged and incorporated herein by reference.

90. Hirsch is the sole and exclusive owner of confidential trade secret information, including but not limited to: financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes regarding *First*. Such information was stored on an external hard drive that contained, specifically, all of the historical research, storyline and plot details, economic information, source code, object code, and VR schematics and blueprints used to create *First,* among other confidential materials.

91. Hirsch obtained exclusive ownership of his confidential trade secret information from Zepre.

92. Hirsch intended to use and continues to use his confidential trade secret information in interstate commerce in connection with *First* and its sequel.

93. Hirsch's confidential trade secret information consists of one or more trade secrets because it derives actual and potential independent economic value from not being generally known to, and not readily ascertainable through proper means by, persons who can obtain economic value from its disclosure or use. For example, by misappropriating Hirsch's confidential trade secret information, Hirsch

is informed and believes that Picture This was able to produce *Fly* in just a fraction of the time and at a fraction of the cost that it took to produce *First*.

94. Zepre and Hirsch took reasonable precautions to protect this confidential trade secret information, including but not limited to: by maintaining the confidential trade secrets on a secure hard drive, granting access to such information only to those with a need for such access, requiring AMD to agree to a confidentiality and nondisclosure provision in its Development Agreement with Zepre, entering into a Nondisclosure Agreement between AMD and Zepre, and forbidding employees and other from disclosing such information to competitors or other third parties who might gain from knowledge of such information.

95. During the course of their business relationship, AMD also had access to Hirsch's confidential trade secret information under circumstances giving rise to a duty to maintain the secrecy of Hirsch's confidential trade secret information.

96. Sometime during AMD's business relationship with Zepre, or after the business relationship had ended, AMD improperly accessed, copied, and disclosed Hirsch's confidential trade secret information to others, including but not limited to Picture This.

97. Picture This knew or had reason to know that AMD had acquired this information by improper means.

98. Nevertheless, Picture This improperly used, and continues to improperly use, Hirsch's confidential trade secret information without Hirsch's consent or permission.

99. As a direct and proximate result of AMD's and Picture This' willful, improper, and unlawful misappropriation of Hirsch's confidential trade secret information, Hirsch has suffered, and will continue to suffer, damages in an amount to be proven at trial. Hirsch will continue to be irreparably harmed unless AMD and Picture This are enjoined from further use and/or disclosure of Hirsch's confidential trade secret information under 18 U.S.C. § 1836(b)(3)(A).

100. Pursuant to 18 U.S.C. § 1836(b)(3)(B), Hirsch is entitled to damages for his actual loss and unjust enrichment not addressed in computing damages for actual loss, or a reasonable royalty.

101. AMD's and Picture This' willful, improper, and unlawful misappropriation of Hirsch's confidential trade secret information was and continues to be willful and malicious, warranting an award of exemplary damages and reasonable attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(C).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

    A.    An award of damages in an amount to be determined at trial;

    B.    Restitution for unjust enrichment;

    C.    An order imposing a constructive trust on the monies wrongfully obtained;

    D.    Injunctive relief as permitted by law;

    E.    Punitive damages as permitted by law;

    F.    Statutory damages as permitted by law;

    G.    Attorneys' fees and costs of suit incurred herein;

    H.    Pre-judgment interest as provided by law; and

    I.    An award of other and further relief the Court may deem just and proper.

Dated: September 30, 2022          KIBLER FOWLER & CAVE LLP

By: _____
MATTHEW J. CAVE
KEVIN J. CAMMISO
CHARLES CARDINAL
Attorneys for Plaintiffs
JONAH HIRSCH and ZYPRE, INC.

## DEMAND FOR JURY TRIAL

Plaintiffs Jonah Hirsch and Zypre, Inc. hereby demand trial by jury pursuant to Federal Rules of Civil Procedure, Rule 38(b) (28 U.S.C. § 38), and Local Rule 38-1.

Dated: September 30, 2022          KIBLER FOWLER & CAVE LLP

By: _____
MATTHEW J. CAVE
KEVIN J. CAMMISO
CHARLES CARDINAL
Attorneys for Plaintiffs
JONAH HIRSCH and ZYPRE, INC.